UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL DENOIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00344-SEB-TAB |
| | ) | |
| ROCHE DIAGNOSTICS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

During and in response to the recent pandemic, Defendant Roche Diagnostic Cor-poration ("Roche") enacted a mandatory vaccination policy requiring all employees to be vaccinated against COVID-19 by November 15, 2021. Plaintiff Michael Denoia ("Mr. De-noia"), a former Roche Information Technology Service Engineer ("IT Service Engineer"), requested a religious exemption from that mandate based on his Christian beliefs. Roche subsequently denied Mr. Denoia's request because he held a customer-facing position with the company. Thereafter, Mr. Denoia transitioned to a non-customer-facing, fixed-term po-sition that expired in December 2022. Mr. Denoia brought this lawsuit against Roche based on Roche's alleged failure to accommodate his religious beliefs in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Arizona Civil Rights Act ("ACRA"), Ariz. Rev. Stat. Ann. § 41-1461 *et seq.*

Pending here before the Court is Roche's Motion for Summary Judgment, dkt. 43, and its Motion to Strike Certain Paragraphs of Plaintiff's Affidavit, dkt. 52. For the reasons

explained below, Roche's Motion for Summary Judgment, dkt 43, is **GRANTED in part** and **DENIED in part**. Roche's Motion to Strike, dkt. 52, is **DENIED**.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because summary judgment requires "no *genuine* issue of *material* fact," "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

As the "put up or shut up" moment in a litigation, summary judgment requires parties to "show what evidence [they] ha[ve] that would convince the trier of fact" to find in their favor on any disputed elements. *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014). Because summary judgment is not "a vehicle for resolving factual disputes," the district court need not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, those tasks belong to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920 (citing *Anderson,* 477 U.S. at 249–50). When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the

2

non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

## BACKGROUND[1]

### I.    Roche's Vaccination Policy

Roche is a biotechnology company that maintains an active role in the healthcare industry—developing diagnostic tests, instruments, and digital solutions for its clients, namely laboratories and hospitals. When the COVID-19 pandemic emerged in early 2020, Roche found itself on the frontlines of efforts to combat both its medical and societal impacts.

After COVID-19 vaccines became widely available, Roche hoped to return to its pre-pandemic business model, which included regular in-person interactions. Accordingly, in August 2021, Roche adopted a mandatory vaccination policy according to which all of its 4,000 employees nationwide were required to receive the COVID-19 vaccine by

---

[1] Our Local Rules unambiguously require parties to "use at least 12-point type in the body" of their submissions, "at least 10-point font in footnotes," and double-spaced text. S.D. Ind. L.R. 5-1(b); *see also id.* at 7-1(e)(1). Our uniform page limitations and formatting requirements help "maintain judicial efficiency" as well as "fairness to opposing parties." *Miller v. Polaris Labs., LLC*, No. 1:11-cv-01004-TWP-DML (S.D. Ind. Feb. 12, 2014). Here, however, Plaintiff's responsive brief appears to have utilized less than 12-point type in various portions of the document, dkt. 48 at 1–7, and less than 10-point type across *all 63 footnotes* as well as a mix of single and 1.75 spacing. Dkt. 48. Courts in this district regularly view such formatting manipulations and excessive use of footnotes as attempts to circumvent the Court's page limits. *See Ohaeme v. Nissan*, No. 1:23-cv-00181-JMS-KMB, 2024 WL 3924584, at *3 (S.D. Ind. Aug. 22, 2024) (ordering party to refile single-spaced brief); *CSX Transp., Inc. v. Zayo Grp., LLC*, No. 1:21-cv-02859-JMS-MJD, 2024 WL 1743156, at *9 n.6 (S.D. Ind. Apr. 23, 2024) (construing use of 41 footnotes as an attempt "to circumvent page limitations"). Although Defendant did not object to Plaintiff's errors under our Local Rules, we caution Plaintiff's counsel that continued attempts to circumvent our Local Rules may result in the court "strik[ing] from the record any document that does not comply with the rules governing the form of documents filed with the court." S.D. Ind. L.R. 1-3; *see Igaski v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956–57 (7th Cir. 2021).

November 15, 2021. Under Roche's vaccination policy, employees could request exemptions for medical conditions, disabilities, and/or religious views.

Roche created what it referred to as the "US DIA Accommodations Team" (the "Accommodations Team"), comprised of eight employees tasked with reviewing exemption requests submitted by employees to the vaccination policy. Roche's leadership provided the Accommodations Team with a list of "customer-facing" positions, a categorization based on "whether the position's duties and responsibilities required the employee . . . to visit customer sites." Ricchio Decl. ¶ 12, dkt. 59-1. In addition to reviewing written accommodation requests, the Accommodations Team also conducted interviews with applicants, particularly those whose positions were customer-facing.

In implementing its vaccination policy, Roche demonstrated a heightened concern for its employees in customer-facing positions, in part due to its clients' various credentialing requirements. Roche's employee representatives were required to prove their vaccination status before visiting the work premises. *Id.* ¶ 14. According to Roche, by 2021, many of its customers had also added COVID-19 vaccination to their credentialing requirements, often without regard to any religious or medical exemptions. *Id.* According to Roche's People Relations Partner Ryann Ricchio, "credentialing requirements were changing and updating quickly in 2021, and Roche could not administratively keep track of these requirements for all current and prospective customers without significant costs and manpower." *Id.* ¶ 15.

Roche received a total of ninety-nine religiously based accommodation requests, sixty-two of which were granted and thirty-seven of which were denied. Of those requests

denied, twenty-seven eventually elected to receive the vaccine. Roche approved at least three accommodations requests for individuals in customer-facing roles, namely, those of two Account Executives and one Field Engineering Specialist. Dkt. 57-8; *see* Ricchio Dep. 46:2–24, 48:5–20, 58:6–12, dkt. 57-2.[2]

## II.    Mr. Denoia's Employment

Mr. Denoia, an Arizona resident, worked for Roche for nineteen years, from 2003 through December 31, 2022. In 2011, Mr. Denoia became an IT Service Engineer, which role principally entailed monitoring servers (ordinarily from the office) and completing on-site product installations. As described by Mr. Denoia, "80 to 90 percent of [his] time" was spent "sit[ting] in the office" and "working on servers," while the remaining "10 to 20 percent" was dedicated to on-site visits "to do a basic install" for Roche's customers, namely, at "laboratories and hospitals." Denoia Dep. 38:15–24, dkt. 58-1; *see also id.* at 106:18–20 ("I might go on-site, you know, travel three, four times a year to a customer site."). As one of only six IT Service Engineers covering Roche's territory throughout the United States and Canada, Mr. Denoia recalled that he and his team were "pretty busy," occasionally requiring Roche to hire a third-party company to complete on-site installations when none of the six were available. *Id.* at 40:23–41:10.

Over time, Mr. Denoia "started doing some support work for the rest of the organization," including "customer service folks" and "field people." *Id.* at 39:5–17. Eventually,

---

[2] Mr. Denoia maintains that at least four other individuals also requested accommodations, but the evidence adduced during discovery was inconclusive as to whether those employees remained in their customer-facing positions or were otherwise accommodated. Pl.'s Resp. Br. 4, dkt. 48.

Roche's product lineup expanded with new products that did not require on-site installations to be performed, and, consequently, Mr. Denoia "very rarely went out for" site visits. *Id.* at 39:23–25. "Most of the time," according to Mr. Denoia, he "sat at home working on [his] computer." *Id.* That said, Mr. Denoia readily acknowledged in his deposition that his position as an IT Service Engineer was customer-facing. *Id.* at 90:2–5.[3]

### III.    Mr. Denoia's Religious Exemption Request

In September 2021, Mr. Denoia submitted his request for a religious exemption from Roche's vaccination policy based on his Christian faith (though he also identified himself as "Buddhist" and "Taoist"). Dkt. 57-4. In his request, Mr. Denoia wrote:

> This whole episode is deeply troubling to me[,] as my "religious" beliefs are deeply personal to me, and I do not talk about them openly. . . .
> Now I am being forced to disclose them to total strangers whose only purpose is to attempt to discredit me. From an emotional standpoint[,] this is most distressing. This action has caused me grief which is manifesting itself as insomnia, trouble concentrating and a general hopelessness and I am sure I am not alone. Do you not see that are [sic] asking people to bare their souls to a complete stranger, this is the worst kind of indignity as you a [sic] putting honest hardworking individuals on trial. . . .
> With that I am sincerely requesting a Religious exemption (my legal right) based on my religious beliefs. Looking forward to discussing religious adherence and their [sic] effects on society.

*Id.*

In a supplemental submission, Mr. Denoia detailed his "deeply held Religious beliefs," as follows:

> Taking of a human life is prohibited except to save another[.]

---

[3] Mr. Denoia testified that Roche no longer categorizes the IT Service Engineer position as customer-facing. Denoia Dep. 107:2–6, dkt. 58-1 (stating that IT Service Engineers "don't go on-site anymore," which he later discovered after he "talk[ed] to people").

> Profiting from the death of another is also prohibited (in this case abortion)[.] . . .
>
> Suicide is also prohibited—as I have prayed about this and understand the possibility of death—Should I die, it would [sic] considered suicide as it is my choice.
>
> Should I be disabled by this vaccine I would not be able to uphold my faith and its practices and therefore fail in my commitment to God. Again it is awareness of the consequences of action that make it sin as God knows ones [sic] heart.

*Id.*

During his interview with the Accommodations Team, Mr. Denoia shared that he was raised "Catholic and Christian" and has researched other religions extensively. *Id.* He sought an exemption from the vaccination policy based on his understanding that "[a]borted fetal cells" were utilized in the vaccine's development, Denoia Dep. 46:11–14, dkt. 58-1, and that the "vaccine possibly has the markings of [the] 'Mark of the Beast,' " dkt. 57-4. Mr. Denoia also objected to the COVID-19 vaccine itself, concerned that it was capable of "genetic manipulation." Denoia Dep. 46:11–14, dkt. 58-1.

The Accommodations Team ultimately denied Mr. Denoia's exemption request on the grounds that his position as an IT Service Engineer was customer-facing. Dkt. 59-3 at 2. Roche did not, however, "make a determination as to whether [Mr. Denoia] had a sincerely held religious belief." Ricchio Decl. ¶ 30, dkt. 59-1.

## IV.   Mr. Denoia's Transfer

To avoid termination, Mr. Denoia accepted a fixed-term, non-customer-facing position as a Trainer/Designer ("Trainer"), effective November 16, 2021. Mr. Denoia's Trainer salary was $99,000, dkt. 57-14, though the parties do not indicate whether this amount is less than what Mr. Denoia earned as an IT Service Engineer. *See* dkt. 57-13 (reflecting the

sum total of Mr. Denoia's gross 2021 earnings as $142,000, including regular salary and various bonuses).

As a "fixed term" employee, Mr. Denoia was "eligible for those benefits given to Term employees," which benefits "differ from those offered to regular employees," dkt. 58-5, but include "Roche's 401(k), healthcare, US retirement plan, Pension Equity Plan, and vacation," Ricchio Decl. ¶ 37, dkt. 59-1. Mr. Denoia's Trainer position was initially set for a six-month term but was later extended through December 31, 2022, after which Mr. Denoia departed his employment with Roche.

## V.  Mr. Denoia's Religious Beliefs

As noted above, Mr. Denoia identifies as a Christian. Denoia Dep. 47:3, dkt. 58-1. Although he reports that he has attended "30 or 40 churches" throughout his life, he has not "found one that suits" him as an adult. *Id.* at 47:4–23. Based on his religious upbringing, Mr. Denoia believes that "you can't kill babies. That's like against God." *Id.* at 46:17–18; *e.g.*, *id.* at 55:3–5 ("[T]he way I was raised, abortion is bad. That's how I was raised. That's what I believe."). In relating his religious beliefs about abortion to his COVID-19 vaccine objections, Mr. Denoia testified that "aborted fetal cells" were "used in the development[,] as far as I know." *Id.* at 46:13, 57:10–14. Mr. Denoia did not indicate that he met with "any religious advisors or anybody to check on whether that was an accurate statement," but he did "look up a lot of stuff online." *Id.* at 57:16–19.

Mr. Denoia also opposes "genetic manipulation" because "it's against God. You're changing the way God made me." *Id.* at 49:8–10. As explained by Mr. Denoia, "your body is a temple, and I don't believe changing the body in that fashion is right. In other words,

God made you one way, you're supposed to remain that way. Not altered by man." *Id.* at 46:22–47:1. Mr. Denoia's self-conducted internet research revealed that two of the three major COVID-19 vaccines "changed" DNA by "go[ing] into the cells" and "reprogram[ing] your body to start spitting out the spike protein." *Id.* at 71:19–72:23. Evidently, "one of the people [Mr. Denoia] spoke with actually mentioned" that the COVID-19 vaccines "could . . . be the Mark of the Beast," further contributing to Mr. Denoia's concerns. *Id.* at 67:9–13.

Overall, Mr. Denoia has stated that he views vaccination matters as "an issue of the heart. I have to make my choices on what I know and follow what I believe is right." *Id.* at 59:3–5. As for the COVID-19 vaccine, Mr. Denoia stated, "I don't believe in it." *Id.* at 46:8–13.

Mr. Denoia "do[es] not have a doctor," but he will go to the doctor's office when doing so is necessary, for example, to "stitch up a wound [or] put something back in place." *Id.* at 59:13–60:15. Mr. Denoia similarly does not "take medications," though he does not "have an issue with general medications." *Id.* at 63:20–21. As far as Mr. Denoia can re-member, he has been vaccinated only against tetanus, though "[n]ot by choice." *Id.* at 55:20–59:2. Aside from the COVID-19 vaccine, Mr. Denoia has never objected to any medical care or treatment (including shoulder and knee surgeries) based on religion. *Id.* at 65:18–66:16.

## VI.    Mr. Denoia's Charges of Discrimination

On November 4, 2021, shortly after Roche denied his religious exemption request, Mr. Denoia submitted an online intake questionnaire to the Equal Employment and Oppor-tunity Commission ("EEOC"). Dkt. 57-21.

### A.    The First Charge

On May 20, 2022, Mr. Denoia submitted EEOC Form 5A, entitled "Charge of Discrimination," via email to EEOC Supervisory Investigator Patricia Miner ("Supervisor Miner"), his contact at the EEOC's District Office in Phoenix, Arizona (the "Phoenix District Office"). Dkt. 57-22 (hereinafter, the "First Charge"). The First Charge (Charge Number 470-2022-00528) contains Mr. Denoia's personal information, Roche's contact information, a brief description of the alleged religious discrimination, and Mr. Denoia's signature. *Id.* In the First Charge, Mr. Denoia averred that, on November 15, 2021, which was the vaccination policy's effective date, Roche committed an act of employment discrimination by "refus[ing] a religious exemption outright for [his] former position." *Id.*

On May 23, 2022, Supervisor Miner notified Mr. Denoia that the First Charge was "considered an unperfected filing which stops the 300 day [sic] deadline from continuing to run." Dkt. 57-23 at 1. That same day, Roche received notice of Mr. Denioa's First Charge. Dkt. 59-5. The EEOC Activity Log, where the EEOC tracked developments in the First Charge, reflects that Supervisor Miner selected the Indiana Civil Rights Commission as the state deferral office. Dkt. 59-4 at 9. On July 29, 2022, the Phoenix District Office issued notice to the Indiana Civil Rights Commission, *see* Ind. Code. § 22-9-1-4, that the First Charge was "initially received by Phoenix District Office . . . and will be dual-filed with Indiana Civil Rights Commission." Dkt. 59-7.

On July 21, 2022, EEOC Federal Investigator Sharon Liebman ("Investigator Liebman") from the Phoenix District Office conducted an intake interview with Mr. Denoia. At the conclusion of the interview, Investigator Liebman noted that Mr. Denoia "**AGREED**

10

NOT to file a Charge of Discrimination," dkt. 58-10 at 2 (emphasis in original), and informed Mr. Denoia that "he would most likely be receiving" a notice of his right to sue, pending her supervisor's approval. Dkt. 59-4 at 6. During his deposition, Mr. Denoia testified that his takeaway from the interview was that he "didn't have a case currently, and [he] would have to wait until [he] was discharged" to renew his efforts with the EEOC. Denoia Dep. 112:6–20, dkt. 58-1.

The next day, on July 22, 2022, Investigator Liebman followed up with Mr. Denoia to offer him one final opportunity to proceed with an investigation of his employment discrimination allegations. In her July 22, 2022, email, Investigator Liebman provided a pre-filled proposed formal charge (the "Proposed Formal Charge") using EEOC Form 5 and directed Mr. Denoia to "review the document and either sign the Charge, or submit any requested edits via the body of this email." Dkt. 59-8 at 1. She further explained that if she "d[id] not receive either the signed charge or any requested revisions within 30 days from the date of this email, [she] w[ould] assume [he] ha[d] changed [his] mind about proceeding . . . and this inquiry m[ight] be closed." *Id.* The Proposed Formal Charge, like the First Charge, alleged that Roche discriminated against Mr. Denoia on the basis of religion by denying his religious exemption. *Id.* at 3. The Proposed Formal Charge also designated the "Arizona Attorney General's Office, Civil Rights Division" as the pertinent state agency, despite the EEOC's previous selection of the Indiana Civil Rights Commission as the deferral office. *Id.* Ultimately, thirty days elapsed, and Mr. Denoia neither signed the Proposed Formal Charge nor replied with requested edits. *See* dkt. 59-4 at 4–6.

On or about September 20, 2022, Mr. Denoia retained legal counsel with whom he shared his EEOC portal account information. Mr. Denoia testified that, once he acquired an attorney and "gave him the accounts," he "left it to [counsel] to take care of." Denoia Dep. 99:22–24, dkt. 58-1. Evidently, Mr. Denoia's attorney successfully accessed Mr. Denoia's portal account, confirming in a September 20, 2022, email to his client that "the portal does not [sic] the charge was filed in May 2022." Dkt. 57-29 at 2.[4]

On September 26, 2022, the EEOC closed the First Charge and issued notice to Mr. Denoia of his right to sue. Dkt. 59-4 at 2; Dkt. 59-9. According to the Activity Log, the EEOC transmitted the notice electronically, though no copies of the email correspondence appear in the record. Dkt. 59-4 at 2.

Although Mr. Denoia's Arizona residence is printed at the top of the right-to-sue letter and is correct, Mr. Denoia maintains that he never received the EEOC's notice in the mail. Likewise, Mr. Denoia denies having ever received electronically a notice of his right to sue, testifying, "I think I went [to the EEOC website] a few times" after retaining counsel, but "I was probably not" checking the account by late September 2022. Denoia Dep. 102:3–11, dkt. 58-1. Mr. Denoia said he expected his attorney to monitor EEOC developments and act on his behalf. *Id.* at 102:20–103:16.

---

[4] Roche asserts that Mr. Denoia retained counsel on September 21, 2022, citing the unverified Amended Complaint as support. Def.'s Br. 10, dkt. 44 (citing Am. Compl. ¶ 20, dkt. 15). Typically, *unverified* complaints comprise nothing more than allegations and, thus, do not have evidentiary value. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017). That said, Mr. Denoia corroborates, rather than refutes, this factual assertion by submitting to the record a September 20, 2022, email exchange, wherein he provided his counsel with access to his EEOC portal account by disclosing his login information. Dkt. 57-29. For purposes of this summary judgment motion, we regard the fact of Mr. Denoia having retained counsel on or about September 20, 2022, as undisputed. *See* Fed. R. Civ. P. 56(e)(2).

On September 28, 2022, Mr. Denoia's counsel—apparently unaware that the EEOC had issued a right-to-sue notice two days prior—submitted an Amended Charge of Discrimination ("Amended Charge") and a letter of representation to Investigator Liebman. Dkt. 57-24 (Amended Charge and letter of representation); Dkt. 59-10 (copy of September 28, 2022, email transmission).

On October 4, 2022, the Amended Charge was uploaded to Mr. Denoia's EEOC portal by Supervisory Investigator Marisol Bingochea ("Supervisor Bingochea"). Meanwhile, the EEOC sent another email to Mr. Denoia notifying him that notice of his right to sue was available for review, as reflected in the Activity Log entries below:

| 10/4/2022 23:02 | Reminder email sent to Mr. Michael Denoia at michael2040@gmail.com that Closure Notice/NRTS document is available to download. | Arcapp User |
| 10/4/2022 10:36 | Uploaded Document. Type: Correspondence with Charging Party Attorney/Representative & FileName:Amended Charge - Denoia v. Roche Diagnostics Corportation; No. 470-2022-00528.msg | MARISOL BINGOCHEA |

Dkt. 59-4 at 2.

The Activity Log further indicates that, on December 8, 2022, the "Charging Party" accessed the portal and downloaded a document, and that, on December 31, 2022, the "Charging Party accessed [the] closed charge":

| 12/31/2022 16:18 | Charging Party accessed closed charge. | Publicportal User |
| 12/31/2022 16:17 | Charging Party accessed closed charge. | Publicportal User |
| 12/8/2022 11:36 | The Charging Party has Downloaded Document. Type: Correspondence with Charging Party Attorney/Representative & FileName:Amended Charge - Denoia v. Roche Diagnostics Corportation; No. 470-2022-00528.msg | Publicportal User |

*Id.*

When questioned during his deposition about his receipt of his right-to-sue notice, Mr. Denoia testified, "I did not receive anything that I'm aware of. As far as I know, I'm assuming all the stuff went to [counsel] after that. I haven't seen anything." Denoia Dep. 110:12–18, dkt. 58-1. Despite the EEOC "internally confirm[ing]" receipt of the Amended Charge and letter of representation on October 4, 2022, Mr. Denoia maintains that his right-to-sue notice was never sent to his counsel. Pl.'s Resp. Br. 13, dkt. 48.

On February 1, 2023, after Mr. Denoia (apparently) disclosed to his attorney "that his charge . . . [wa]s closed on the portal," a paralegal from the law firm contacted Supervisor Bingochea to inquire about the status of the First Charge and/or the Amended Charge, as the firm had neither "received the" right-to-sue notice nor "ha[d] access to the portal." Dkt. 57-25 at 2.

On February 6, 2023, Supervisor Bingochea responded saying "[t]here [wa]s no record of [the] firm representing the Charging Party" and, as such, she declined to "discuss any [further] information." *Id.* at 1–2. After counsel resubmitted the Amended Charge and letter of representation from September 28, 2022, Supervisor Bingochea transmitted a copy of the right-to-sue notice, which, she said, Mr. Denoia had "downloaded on September 27, 2022." *Id.* at 1.

Later on February 6, 2023, Mr. Denoia's attorney contacted Supervisor Bingochea, concerned that he had "received the right to sue but not for the [A]mended [C]harge that was submitted." Dkt. 57-26 at 1. Supervisor Bingochea replied as follows:

> On September 28, 2022, you requested to amend the charge[,] which is after the EEOC issued a Notice of Right to Sue on September 26, 2022. The EEOC will not take any further action to the referenced charge.

*Id.* Supervisor Bingochea directed Mr. Denoia's counsel to contact Supervisor Miner with any additional questions.

On February 8, 2023, Mr. Denoia's counsel emailed Supervisor Bingochea to inquire:

> Can you let me know if the charging party downloaded a copy of the right to sue notice (if so when) or how it was delivered to him? He has told me that he did not receive a copy of the notice until we provided him a copy of the one emailed to us.

Dkt. 57-27 at 2. Apparently, Mr. Denoia's counsel's request went unanswered, perhaps because Supervisor Bingochea had thereafter departed from the EEOC.

On February 17, 2023, Mr. Denoia's counsel forwarded his February 8th email to Supervisor Miner, who replied on February 21, 2023, as follows:

> A review of our records reflects an automated message was sent to the Charging Party on September 26, 2022, the date the Notice of Right to Sue was uploaded, informing him there was documentation available for him to review. A second automated message was sent on October 4, 2022. I do not reflect the Charging Party accessed the record until December 31, 2022. There is no indication the Charging Party downloaded any documentation from his portal account.

Dkt. 57-27 at 1.

## B.    The Second Charge

On March 27, 2023, Mr. Denoia, by counsel, filed a second charge of discrimination, EEOC Charge Number 470-2023-02637 (the "Second Charge"), averring that Roche discriminated and retaliated against him on the basis of his religion and age, in violation of

Title VII and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* The record evidence does not reflect that the Second Charge was dual filed in either Indiana or Arizona.

**VII.   Procedural History**

Mr. Denoia initiated the present litigation in this court on February 27, 2023, by filing his complaint alleging a single count of religious discrimination under Title VII and the ACRA. On April 5, 2023, after receiving notice of his right to sue for the Second Charge, Mr. Denoia filed the Amended Complaint, restating his claim for religious discrimination and adding claims for age discrimination under the ADEA and retaliation under Title VII and the ACRA.

On May 4, 2023, Roche moved for judgment on the pleadings with regard to the religious discrimination claim, contending that Mr. Denoia's allegations were untimely. We denied Roche's motion explaining that Roche's timeliness arguments were affirmative defenses that could not be resolved on the pleadings alone. Dkt. 33.

On April 26, 2024, Roche moved for summary judgment on all claims, dkt. 43, and, on June 27, 2024, moved to strike certain paragraphs of Mr. Denoia's Affidavit, dkt. 52. Both motions are fully briefed and now ripe for ruling.

**DISCUSSION**

As an initial matter, Mr. Denoia concedes "that discovery has generated insufficient evidence to support his Title VII discrimination, Title VII retaliation, and ADEA discrimination claims." Dkt. 48 at 2 n.2. As such, Roche's motion for summary judgment is

**GRANTED** with regard to those claims. Mr. Denoia's failure-to-accommodate claims under Title VII and the ACRA remain.

We turn first to address Roche's Motion to Strike, dkt. 52, and then resolve Roche's Motion for Summary Judgment, dkt. 43.

## I.    Roche's Motion to Strike

Roche requests that paragraphs of Mr. Denoia's Affidavit which accompanies Mr. Denoia's summary judgment responsive brief be stricken. Dkt. 57-11. Specifically, Roche contends that Paragraphs 3, 15, and 16 of Mr. Denoia's Affidavit contradict his prior deposition testimony regarding the frequency of on-site customer visits that his prior position entailed as well as his familiarity with the EEOC grievance process. Dkt. 53 at 1. Mr. Denoia responds arguing that Roche's motion be denied for violating Local Rule 56-1(i), which states that "[t]he court disfavors collateral motions—such as motions to strike—in the summary judgment process. Any dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief." S.D. Ind. L.R. 56-1(i).

Our Local Rules are unequivocal: arguments concerning the admissibility of evidence on summary judgment "*must* be" incorporated in a party's brief—not raised by a separate motion. *Id.* (emphasis added); *accord Sickels v. Cent. Nine Career Ctr.*, No. 1:10-CV-00479-SEB, 2012 WL 266945, at *6 n.9 (S.D. Ind. Jan. 30, 2012) (stating that evidentiary objections are "appropriately raise[d]" in a "reply brief rather than as a separate motion to strike").

Mr. Denoia filed his summary judgment responsive brief, along with the challenged affidavit, on June 7, 2024. Roche timely filed its summary judgment reply brief on June

21, 2024, within the fourteen-day deadline provided by our Local Rules, *id.* at 56-1(c), stating (albeit in a footnote) that Mr. Denoia's "Affidavit contradicts [his] sworn deposition testimony. Roche is filing a motion to strike portions of the Affidavit." Dkt. 51 at 3 n.1. Nearly a week later, on June 27, 2024, Roche moved to strike portions of Mr. Denoia's Affidavit. Dkt. 52. We repeat: the directives of Local Rule 56-1(i) are mandatory and un-ambiguous: Challenges to the admissibility or effect of evidence "must be" raised within a party's brief. Roche's failure to do so, alone, supports denying its motion to strike.

We concede that Courts in this District sometimes overlook noncompliance with Local Rule 56-1(i) where the party has adequately raised its objection in a reply brief and filed a separate motion to strike contemporaneously. *E.g.*, *Haynes v. Ind. Univ.*, No. 1:15-cv-01717-LJM-DKL, 2017 WL 3581634, at *9 (S.D. Ind. Aug. 18, 2017), *aff'd*, 902 F.3d 724 (7th Cir. 2018); *Gralia v. Edwards Rigdon Constr. Co., Inc.*, No. 1:19-cv-02079-JMS-MPB, 2020 WL 5913280, at *3 (S.D. Ind. Oct. 6, 2020) (motion to strike filed on same day as summary judgment reply brief). That appears to be Roche's strategy here: indicating in its reply brief that it intended to file a motion to strike, but its delay in doing so for nearly a week allowed the deadline for filing a reply brief to pass. We shall enforce the plain language of our Local Rules and **DENY** Roche's motion accordingly.

## II.    Roche's Motion for Summary Judgment

Roche contends that Mr. Denoia's Title VII failure-to-accommodate claim is a non-starter due to Mr. Denoia's failure to file timely charges of discrimination with the EEOC as well as his failure to initiate this lawsuit within the required timeframe. Alternatively, Roche asserts that Mr. Denoia's Title VII claim fails on its merits. As for Mr. Denoia's

ACRA claim, Roche contends that it must be dismissed because Mr. Denoia failed to exhaust his administrative remedies. We address each of these issues *seriatim*.

### A.    Failure to Exhaust Administrative Remedies under Title VII

Before bringing a lawsuit under Title VII, a plaintiff must exhaust his administrative remedies, which entails the filing of a charge of discrimination with the EEOC. Once a claimant "has received a right-to-sue letter from the EEOC, signifying that the EEOC will not provide him with any relief," the claimant may file his claims in court. *Hill v. Potter*, 352 F.3d 1142, 1145 (7th Cir. 2003).

Failure to exhaust administrative remedies is an affirmative defense, meaning that the defendant bears the burden of proof establishing that the administrative remedies have not been fully exhausted. *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009). "At summary judgment, a defendant who asserts this affirmative defense must show that there is no genuine dispute of material fact as to whether the plaintiff timely filed with the EEOC." *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 744 (7th Cir. 2021). "The defendant can establish its affirmative defense . . .  by pointing to evidence that affirmatively shows that the plaintiff failed to timely file" or "by pointing to the absence of evidence in the record to support the plaintiff's timeliness." *Id.* (citations omitted). If a defendant takes the latter approach, "the plaintiff must then 'demonstrate that there is evidence' upon which a jury could determine that she timely filed with the EEOC." *Id.* (quoting *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013)).

Here, Roche maintains that it is entitled to summary judgment on Mr. Denoia's Title VII claim due to Mr. Denoia's failure to file an EEOC charge within 300 days of the alleged

employment discrimination and/or, alternatively, due to his failure to initiate this lawsuit within ninety days of his receipt of the right-to-sue letter from the EEOC.

### 1.    Timeliness of EEOC Charge

"If a complainant initially institutes proceedings with a state or local agency with authority to grant or seek relief from the practice charged, the time limit for filing with the EEOC is extended [from 180] to 300 days." *E.E.O.C. v. Com. Off. Prod. Co.*, 486 U.S. 107, 110 (1988); 42 U.S.C. § 2000e-5(e). "Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the [EEOC] requires." 42 U.S.C. § 2000e-5(b). Under federal regulations, "a charge is sufficient when the [EEOC] receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). "[I]f a filing is to be deemed a charge, it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008); *see*, *e.g.*, *Carlson v. Christian Brothers Servs.*, 840 F.3d 466, 467–68 (7th Cir. 2016).

Here, Roche's alleged failure to accommodate Mr. Denoia's request occurred on November 15, 2021, the vaccination policy's effective date, making September 11, 2022, the 300-day deadline for Mr. Denoia to file a charge of discrimination with the EEOC. According to Roche, Mr. Denoia never properly completed the EEOC process because his charge of discrimination "was unsigned when submitted." Def.'s Br. 13, dkt. 44 (citing dkt. 58-7).

20

Unfortunately, Roche's references to the record evidence have generated unnecessary confusion regarding precisely which exhibit is, at least according to Roche, Mr. Denoia's First Charge. In its summary judgment briefs, Roche cites Docket Entry 58-7, a prefilled EEOC Form 5 that is identical in every respect—down to matching bates numbers—to Docket Entry 59-8, *i.e.*, the Proposed Formal Charge that was emailed to Mr. Denoia after his intake interview in *July 2022*. Beyond its assertion that it was "notified" of the First Charge on *May 23, 2022*, Roche offers no explanation for this highly material factual discrepancy and thus fails to "affirmatively" prove its entitlement to judgment as a matter of law. *Chatman*, 5 F.4th at 744.

Additionally, Mr. Denoia rebuts Roche's argument that he failed to file a timely charge by relying on evidence of his May 20, 2022, submission of EEOC Form 5A to Supervisor Miner. Dkt. 57-22. Roche contends that the document Mr. Denoia represents as the First Charge is "unsworn," and contends that "[t]here is no evidence this document was 'filed.' " Def.'s Reply Br. 3–4 & n.2. The record evidence, however, belies Roche's characterization. The First Charge contains the parties' identities, a description of the alleged discrimination, a date, and Mr. Denoia's signature. Dkt. 57-22 at 2. Printed directly above Mr. Denoia's signature is an acknowledgment that he "understand[s] by signing below that [he is] *filing a charge of employment discrimination with the EEOC*," *id.* (emphasis added), as well as an affirmation that he "**declare[s] under penalty of perjury that the above is true and accurate**," *id.* (emphasis in original). A reasonable jury could, on the basis of this evidence, conclude that the First Charge was, in fact, "sworn."

The record evidence likewise puts the lie to Roche's assertion that the First Charge was never "filed." Indeed, on May 23, 2022, Supervisor Miner confirmed in an email that Mr. Denoia "*submitted*" the "unperfected" First Charge, which "*stop*[*ped*] *the 300 day deadline from continuing to run*." Dkt. 59-6 (emphasis added); *see also* 29 C.F.R. § 1601.3(b) (providing that "the terms file, serve, submit, receive, transmit, present, sent, issue, and notify shall include all forms of digital transmission"). The EEOC further assigned an official charge number to Mr. Denoia's submission, and the Activity Log contains several entries from May 23, 2022, which state as follows: "A charge is formalized"; "Case status changed from Inquiry Submitted to Charge filed"; and "Uploaded Document . . . Form 5A." Dkt. 59-4 at 9.  On this record, a reasonable jury could easily determine that Mr. Denoia "filed" the First Charge with the EEOC. *See Chatman*, 5 F.4th at 744.

True, as Roche emphasizes, the EEOC described Mr. Denoia's initial submission as "unperfected," but neither party has explained the legal significance of that label nor the difference it makes in the context of the unrefuted fact that Mr. Denoia's submission "stop[ped] the 300 day deadline from continuing to run." Dkt. 59-6. In any event, the unexplained meaning of "unperfected" does not overcome the undisputed record evidence demonstrating that Mr. Denoia submitted a self-entitled Charge of Discrimination on May 20, 2022; that the EEOC acknowledged Mr. Denoia's submission on May 23, 2022 (as reflected in Supervisor Miner's email and the Activity Log); and that the EEOC regarded Mr. Denoia's submission as stopping the 300-day deadline. This evidence, taken as a whole and in the light most favorable to the non-moving party, supports a finding that Mr. Denoia timely filed the First Charge.

###### 2.    *Timeliness of Initiating This Lawsuit*

Title VII requires "that civil actions be filed 'within ninety days after the [agency's] giving of [final decision] notice.' " *Lax v. Mayorkas*, 20 F.4th 1178, 1182 (7th Cir. 2021) (alterations in original) (quoting 42 U.S.C. § 2000e-5(f)(1)). The ninety-day "filing window begins when a claimant or his attorney 'actually receives' the right-to-sue notice that accompanies the agency's final decision." *Id.* (quoting *Jones v. Madison Serv. Corp.*, 744 F.2d 1309, 1312 (7th Cir. 1984)). The Seventh Circuit "has further clarified that receiving the notice"—either through traditional mail or email—"without opening or reading that notice, is sufficient to trigger the beginning of the filing period." *Id.* at 1182–83 (citing *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 849–50 (7th Cir. 2001)). In other words, "the date of receipt . . . is unaffected by the recipient's failure to read the notice until a later time." *Id.* at 1183.

Here, Roche avers that Mr. Denoia's Title VII claim is untimely because he failed to bring it within ninety days of his receipt of the notice of his right to sue from the EEOC. According to Roche, the EEOC mailed the right-to-sue notice to Mr. Denoia's Arizona residence on September 26, 2022. When a right-to-sue notice is transmitted through traditional mail, courts typically "presume[ ] timely delivery" thereof, so long as the notice was sent in "a properly addressed piece of mail." *Bobbitt v. Freeman Cos.*, 268 F.3d 535, 538 (7th Cir. 2001). Applying this principle to the instant matter, Roche argues that, because the September 26th right-to-sue notice lists Mr. Denoia's address correctly, he presumptively received timely notice, thereby rendering his February 27, 2023, complaint untimely.

Mr. Denoia readily concedes that the EEOC's right-to-sue notice contains the correct mailing address. However, Roche has failed to adduce any record evidence demonstrating that the EEOC did in fact send Mr. Denoia a copy of the notice via traditional mail. *See Yehudah v. Chi. Park Dist.*, No. 97 C 5282, 1999 WL 104717, at *3 (N.D. Ill. Feb. 23, 1999) (denying motion to dismiss where defendant produced no evidence that the right-to-sue notice "was actually mailed or received"). Mr. Denoia, for his part, also maintains that he "never received the EEOC issued Right to Sue via mail . . . ." Denoia Aff. ¶ 16, dkt. 57-11; *e.g.*, Denoia Dep. 100:6–101:16, dkt. 58-1 (testifying that he never received his right-to-sue notice in the mail). Roche's failure to adduce record evidence of the EEOC's having ever mailed the right-to-sue notice, coupled with Mr. Denoia's categorical denial of his having received any letter from the EEOC, creates a triable issue of fact, as only the trier of fact may make credibility determinations necessary to decide who to believe. *Taylor v. Nw. Mem'l Hosp.*, 521 F. Supp. 3d 714, 717 (N.D. Ill. 2021). In light of these unresolved factual disputes concerning whether the EEOC mailed Mr. Denoia his right-to-sue notice and/or whether Mr. Denoia actually received it, Roche is unable to establish that it is enti-tled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(c)(1).

The rule respecting receipt of traditional mail notwithstanding, Roche submits that the EEOC Activity Log reveals two dates on which Mr. Denoia indisputably received dig-ital notice of his right to sue: first, on September 26, 2022, when the EEOC sent an email to him stating that "a new document [wa]s available to download" on his portal account; and, again, on October 4, 2022, when the EEOC sent a "[r]eminder email" to Mr. Denoia that "Closure Notice/NRTS document [wa]s available to download." Dkt. 59-4 at 2. Even

adopting the date most favorable to Mr. Denoia, October 4, 2022, Roche maintains that the February 27, 2023, complaint is clearly untimely.

Mr. Denoia, by contrast, urges that he "wasn't aware of the right to sue" when it was issued on September 26, 2022, Denoia Dep. 99:10, dkt. 58-1, and further denies ever having received notice via email, Denoia Aff. ¶ 16, dkt. 57-11. Mr. Denoia maintains that the earliest date on which he actually received notice of his right to sue was December 31, 2022, when he accessed his EEOC portal account and discovered that his First Charge had been closed. According to Mr. Denoia, the EEOC "confirmed" his December 31st receipt when Supervisor Miner noted in her February 17, 2023, email that her review of the records "d[id] not reflect the Charging Party accessed the record until December 31, 2022." Dkt. 57-27 at 1.

Thus, the dispositive question before us is whether the ninety-day filing window began on September 26, 2022, and/or October 4, 2022, when the EEOC emailed Mr. Denoia, or on December 31, 2022, when Mr. Denoia evidently accessed his portal account.

The Seventh Circuit's 2021 decision in *Lax v. Mayorkas* (which neither party has discussed in its briefing) is instructive. 20 F.4th at 1182. There, the plaintiff received an email from the EEOC notifying him of the agency's final decision, a copy of which had been attached to the email correspondence. *Id.* at 1180–81. Due to technical difficulties, however, the plaintiff did not open and read the attachment until the following day. *Id.* After reviewing "the full agency decision," the "related email transmission," and the plaintiff's sworn declaration, the district court dismissed the action as untimely because the

plaintiff filed his complaint ninety-one days (rather than ninety days) after receipt of the email. *Id.* at 1181 & n.1.

In affirming the district court's dismissal, the Seventh Circuit ruled that the ninety-day filing window commences on the day that the plaintiff *receives an email* from the EEOC notifying him of the agency's final decision. *Id.* at 1182. Where the plaintiff himself "concede[d] that he read the body of the email, which clearly indicated that his final agency decision was attached," the court was unpersuaded that any alleged technical difficulties in viewing the attachment postponed the start of the filing window. *Id.* At bottom, the court concluded, "the date of receipt, which triggers the filing window, is unaffected by the recipient's failure to read the notice until a later time." *Id.* at 1183; *accord McDonald v. St. Louis Univ.*, 109 F.4th 1068, 1071 (8th Cir. 2024) (citing *Lax* to support affirming entry of summary judgment against plaintiff on timeliness grounds and holding that ninety-day filing window began when EEOC emailed plaintiff's lawyer with link to right-to-sue letter).

Following the Seventh Circuit's decision in *Lax*, an emerging series of district courts have likewise concluded that plaintiffs cannot postpone the ninety-day filing deadline by refusing or otherwise neglecting to access their EEOC portal accounts after receiving notice by email. In *Paniconi v. Abington Hospital-Jefferson Health*, for instance, the district court dismissed a complaint as time-barred, specifically rejecting the plaintiff's assertion that the ninety-day period began only after she accessed her portal account and downloaded her right-to-sue letter. 604 F. Supp. 3d 290, 292–93 (E.D Pa. 2022). That court concluded that, once a party or her attorney receives the email notification, "it is irrelevant when" she or her "counsel actually follow[s] the link to access the EEOC portal." *Id.* at 293; *see, e.g.,*

*Moore v. R1 RCM*, No. 22-cv-2216, 2023 WL 3047431, at *1–2 (C.D. Ill. Apr. 4, 2023), *adopted*, 2023 WL 3046797 (C.D. Ill. Apr. 21, 2023); *Nascimben v. Feld Ent., Inc.*, No. 8:24-CV-98-WFJ-SPF, 2024 WL 3673706, at *3–4 (M.D. Fla. Aug. 6, 2024); *Long v. Amazon.com Servs. LLC*, No. C23-209RSL, 2024 WL 1860168, at *2 (W.D. Wash. Apr. 29, 2024), *appeal docketed*, No. 24-3257 (9th Cir. May 22, 2024); *McNaney v. Sampson & Morris Grp., Inc.*, No. 2:21-cv-1809, 2022 WL 1017388, at *3–4 (W.D. Pa. Apr. 5, 2022).

Applying these principles to the case at bar, we conclude that a genuine dispute of material fact exists regarding whether (and when) Mr. Denoia actually received the notice of his right to sue. In asserting that Mr. Denoia received digital notice of his right to sue as early as September 26, 2022, and as late as October 4, 2022, Roche relies exclusively on the EEOC Activity Log. Unlike *Lax*, where the materials available for judicial review included a copy of the email correspondence from the EEOC as well as the plaintiff's sworn admission that he read the email, there is no dispositive evidence before us of the alleged email communications, never mind any admission from Mr. Denoia of having received or read them. Without record evidence of the email transmissions, we cannot discern the accuracy of the Activity Log entries or otherwise confirm Mr. Denoia's receipt.[5]

---

[5] Mr. Denoia also contends that the EEOC's emails cannot establish actual receipt because the EEOC failed to send either email to his counsel, who he had retained as early as September 20, 2022. Pl.'s Resp. Br. 12, 19–20, dkt. 48. However, in our view, this assertion by Mr. Denoia is meritless. When a "plaintiff actually receives notice from the EEOC, the attorney's receipt is irrelevant; it is simply not required for the [ninety]-day period to begin running." *Threadgill*, 269 F.3d at 850. "Nowhere in our case law" suggests a different outcome. *Id.*; *see Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 92–93 (1990).

Additional unresolved factual disputes remain unexplained by the parties that preclude the entry of summary judgment. For example, neither party addresses the apparent discrepancy between Supervisor Bingochea's February 6, 2023, email, in which she stated that Mr. Denoia had "downloaded" his right-to-sue notice on September 27, 2022, dkt. 57-25 at 1, and Supervisor Miner's follow-up February 21, 2023, email, in which she stated that "[t]here [wa]s no indication the Charging Party downloaded any documentation from his portal account," dkt. 57-27 at 1. Additionally, despite Mr. Denoia's position that he received notice on December 31, 2022, the record contains evidence of a February 8, 2023, email from his attorney suggesting that Mr. Denoia "did not receive a copy of the notice until [his attorney] provided . . . a copy of" it. Dkt. 57-27 at 2. Once again, the parties offer no explanations for these discrepancies. Lastly, the Activity Log reveals that the "Charging Party" downloaded a document from the portal on December 8, 2022. Dkt. 59-4 at 2. While Roche asserts that this entry proves that Mr. Denoia's attorney "checked the EEOC portal," Def.'s Br. 11, dkt. 48, it points to no corroborating evidence illuminating the context for this Activity Log entry such that we can make any legal conclusions regarding Mr. Denoia's actual receipt of notice.

Accordingly, the record evidence, viewed as a whole and in the light most favorable to the non-moving party, could support a reasonable jury's conclusion that Mr. Denoia did not actually receive notice of his right to sue until well after the EEOC had closed the First

Charge and issued its final determination—thereby supporting a conclusion that Mr. De-noia timely filed this action.[6]

### B.      Failure to Accommodate under Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against an individual with respect to his com-pensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). For purposes of Title VII, "religion" encompasses "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j).

To prevail on a failure-to-accommodate claim, a plaintiff must make a *prima facie* showing that (1) he adheres to an observance or practice that is religious in nature; (2) that is based on a sincerely held religious belief; (3) that conflicted with an employment re-quirement; and (4) the religious observance or practice was the basis or a motivating factor for the employee's discriminatory treatment. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 883 (7th Cir. 2023), *vacated on other grounds*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023). If a plaintiff successfully establishes his *prima facie* case, the burden shifts to the employer to demonstrate that it reasonably accommodated the plain-tiff's religious beliefs or that it could not accommodate the plaintiff's religious beliefs

---

[6] Having concluded that a dispute of material fact remains regarding Mr. Denoia's actual receipt, we do not reach Mr. Denoia's equitable tolling argument.

without undertaking an undue hardship. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013).

       *1.*    *Mr. Denoia's* Prima Facie *Case*

Roche contends that Mr. Denoia cannot satisfy the first three elements of his *prima facie* case. We address below each element in turn.

       a.    <u>Religious Nature of Observance or Practice</u>

The first issue raised by Mr. Denoia's *prima facie* failure-to-accommodate claim is whether the observance or practice asserted as the basis for his accommodation request is religious in nature. "Title VII's broad and intentionally hands-off definition of religion" protects "all religious beliefs that are sincerely held." *Id.* at 448, 452. "[S]incere and meaningful" religious beliefs "occup[y] a place in the life of [their] possessor parallel to that filled by the orthodox belief in God." *Id.* at 448 (quoting *United States v. Seeger*, 380 U.S. 163, 165–66 (1965)); *see also Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978) (defining "what is 'religious' " as whether "the 'belief' for which protection is sought [is] 'religious' in [the] person's own scheme of things" and is "sincerely held"). In evaluating an asserted religious belief, courts must "give[ ] great weight" to "the claim of the registrant that his belief is an essential part of a religious faith . . . ." *Adeyeye*, 721 F.3d at 448 (quoting *Seeger*, 380 U.S. at 184).

Mr. Denoia identifies as a Christian, *see* Denoia Dep. 47:3, dkt. 58-1, (though, in his exemption request, he identified more expansively as "Christian, Buddhist, [and] Taoist," dkt. 57-4). In a supplemental response to his accommodation request, Mr. Denoia described the relevant tenets of his "deeply held [r]eligious beliefs" as follows: "[t]aking of a

human life is prohibited except to save another" and "[p]rofitting from death of another is also prohibited (in this case abortion)." *Id.* He further stated that, "[s]hould [he] be disabled by this vaccine[,] [he] would not be able to uphold [his] faith and its practices and therefore fail [sic] in [his] commitment to God." *Id.* In a subsequent interview with Roche's Accommodations Team, Denoia Dep. 75:7–9, dkt. 58-1, Mr. Denoia shared that he was "raised Christian and Catholic," instilling in him his belief that "life is valuable and abortion in a sin," dkt. 57-4.

Mr. Denoia concluded that receiving the COVID-19 vaccine violated his core religious beliefs in any of three ways: (1) because "[a]borted fetal cells" were utilized in the development of the COVID-19 vaccine, but "you can't kill babies. That's like against God," Denoia Dep. 46:13–18, 71:4–5, dkt. 58-1; (2) because "genetic manipulation" does not comport with his belief that "your body is a temple" and "God made you one way, [so] you're supposed to remain that way," *id.* at 46:13–25; and (3) because "one of the people [he] spoke with actually mentioned" that the COVID-19 vaccine could be "the Mark of the Beast," *id.* at 67:11–13. During his deposition, Mr. Denoia testified that the COVID-19 vaccines were developed using "an aborted fetal cell line going back some years," which explains his first objection. *Id.* at 71:4–5. As for his views about genetic manipulation, Mr. Denoia explained as follows: "So literally you've got a cell. They are going to go into the cells. They are going to do exactly what a virus does and reprogram your body to start spitting out the spike protein. That's as simple as it is. That's changing my code." *Id.* at 72:20–25. Mr. Denoia reiterates his concern about "the Mark of the Beast," albeit without further explanation. *See* dkt. 57-4; Denoia Dep. 67:13, dkt. 58-1.

Roche maintains that Mr. Denoia's objections concerning aborted fetal cells, genetic manipulation, and "the Mark of the Beast" are not religious in nature, but rather are rooted in his personal disapproval of and "medical beliefs" about the COVID-19 vaccine. Roche relies on Mr. Denoia's testimony that he generally dislikes doctors' visits, Denoia Dep. 58–61, dkt. 58-1, and that he does not "believe" in the COVID-19 vaccine. Def.'s Reply Br. 7, dkt. 51.

"[A]n employee is not permitted to define a purely personal preference or aversion as a religious belief." *Dockery v. Maryville Acad.*, 379 F. Supp. 3d 704, 715 (N.D. Ill. 2019) (alteration in original) (quoting *Reed v. Great Lakes Cos., Inc.*, 330 F.3d 931, 935 (7th Cir. 2003)). Here, Mr. Denoia explained during his deposition that he generally avoids the doctor except "when necessary" because he regards himself as healthy—"not due to religion." Denoia Dep. 61:8–13, dkt. 58-1. Insofar as Mr. Denoia's objection to the COVID-19 vaccine stems from his blanket aversion to doctors' visits, we agree with Roche that such an explanation, in and of itself, does not constitute a "religious belief" for purposes of his Title VII claim.

That said, we disagree with Roche that Mr. Denoia's remaining objections concerning the alleged use of aborted fetal cells in the COVID-19 vaccine's development; the possibility of genetic manipulation; and the so-called "Mark of the Beast" cannot, as a matter of law, constitute "religious" beliefs for purposes of Title VII. The Seventh Circuit recently rejected such an argument in *Passarella v. Aspirus, Inc.*, where two employees, much like Mr. Denoia, sought religious exemptions from their employer's COVID-19 vaccination mandate. 108 F.4th 1005, 1012 (7th Cir. 2024). There, both employees objected to the

COVID-19 vaccines based on their religious convictions (e.g., abortion and "my body is a temple") as well as medical safety concerns (e.g., the vaccine causes blood clots and was "developed in a rush"). *Id.* at 1007–08. The district court dismissed the complaint, reasoning that the plaintiffs' exemption requests reflected "medical judgment rather than religious conviction." *Id.* at 1008. The Seventh Circuit reversed and remanded the district court's dismissal, clarifying that "the fact that an accommodation request also invokes or . . . even turns upon secular considerations does not negate its religious nature." *Id.* at 1010. Indeed, as the Seventh Circuit explained, "Congress permitted" employees to assert objections "to an employer's vaccine mandate on both religious and non-religious grounds," as there is "no other way to give effect to the breadth of [Congress's] definition of 'religion'—as covering 'all aspects' of an employee's religious observance, practice, and belief." *Id.* at 1009 (quoting 42 U.S.C § 2000e(j)).

Consistent with these principles, we find that a reasonable jury could find that Mr. Denoia's stated reasons for declining to vaccinate against COVID-19 were religious in nature. Insofar as non-religious considerations also factored into Mr. Denioa's decision, they do not, as a matter of law, "negate" the religious aspects of his objections, for "matter[s] of personal conviction can root [themselves] in both religious and non-religious reasons." *Id.* at 1010.

b.    Sincerity of Belief

We turn next to the sincerity of Mr. Denoia's religious beliefs. "Title VII and courts . . . do not require perfect consistency in observance, practice, and interpretation when determining . . . whether a person's belief is sincere." *Adeyeye*, 721 F.3d at 453. To that end,

33

a plaintiff need not "be a member of an authorized church or subscribe to its full menu of orthodox beliefs" to have sincerely held religious beliefs. *Dockery*, 379 F. Supp. 3d at 714. While "[c]hecking for sincerity and religiosity is important to weed out sham claims," *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013), "[t]hese are matters of interpretation where the law must tread lightly," *Adeyeye*, 721 F.3d at 453. "The sincerity of a person's religious beliefs generally is an issue of fact not properly resolved on a motion for summary judgment," as such inquiries often turn on assessments of the employee's credibility. *Dockery*, 379 F. Supp. 3d at 716 (citing *EEOC v. Ilona of Hung., Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997)).

It is undisputed in our case that Mr. Denoia was raised in a Catholic and Christian household and that he identifies as a Christian. Despite having attended more than thirty churches throughout his lifetime, Mr. Denoia currently does not attend church regularly nor is he a member of an organized church. *See* Denoia Dep. 47:4–7, dkt. 58-1. With regard to the COVID-19 vaccine, Mr. Denoia did not seek guidance from religious advisors, relying instead on his own internet research as well as the advice of his friends and coworkers. *Id.* at 57:16–19, 66:25–68:5. After conducting his own research regarding the COVID-19 vaccines, Mr. Denoia concluded that his religious convictions relating to abortion, maintaining his body as a "temple," and "the Mark of the Beast" prevented him from choosing to receive the vaccine. From this evidence, a reasonable jury could conclude that Mr. Denoia's religious beliefs are (or were) sincerely held.

Roche asserts that Mr. Denoia's infrequent church attendance demonstrates that his religious beliefs are not sincerely held. However, the law is clearly established that "in a

case of religious discrimination," a plaintiff need not "be a member of an authorized church . . . ." *Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir. 1997).

Roche also argues that Mr. Denoia's religious beliefs concerning medicine and vaccinations cannot be deemed sincere because Mr. Denoia "has been vaccinated and . . . has never objected to any medical procedure based on religion" in the past. Def.'s Br. 17, dkt. 44. Roche misrepresents Mr. Denoia's testimony in this respect. While Mr. Denoia did disclose that he received a tetanus vaccine, he also stated that it was "[n]ot by choice." Denoia Dep. 58:20–59:2, dkt. 58-1. His precise words were as follows: "I was in the emergency room. They had an IV hooked up to me. Nurse came over, shoved something in my arm. I asked what she did. She told me. By that time it was too late." *Id.* Beyond this isolated incident, Mr. Denoia maintains that he has received no other vaccines in the past ten years. *Id.* The evidence adduced by Roche, therefore, does not demonstrate, as a matter of law, that Mr. Denoia's religious beliefs were insincere.

c.  Conflict with Employment Requirement

Roche challenges whether Mr. Denoia's religious beliefs in fact conflicted with his employment requirements, citing to *Summers v. Whitis*, No. 4:15-cv-00093-RLY-DML, 2016 WL 7242483 (S.D. Ind. Dec. 15, 2016). In *Summers*, a deputy clerk objected on religious grounds to processing marriage licenses for same-sex couples. *Id.* at *1. In granting the defendant's motion for summary judgment, the court held that the plaintiff's religious beliefs, "no matter how sincerely espoused, d[id] not objectively conflict with the purely administrative duty to process marriage licenses." *Id.* at *7. The court further concluded

that "Title VII is not a license for employees to perform only those duties that meet their private approval." *Id.*

We find Roche's reliance on *Summers* misplaced, as the employment requirement at issue here—that all employees be vaccinated against COVID-19—cannot fairly be characterized as an administrative task, which was the requirement at issue in *Summers*. Rather, "Roche mandated that all its employees receive the COVID-19 vaccination, not merely perform administrative duties related to the vaccines." *Sterle v. Roche*, No. 1:22-cv-01654-RLY-MJD, dkt. 103 at 18 (S.D. Ind. Aug. 22, 2024) (Entry Denying Defendant's Motion for Summary Judgment). Moreover, Roche does not explain why Mr. Denoia was required to find a different position (or risk termination) if his religious objection to receiving the COVID-19 vaccine did *not* conflict with the requirements of his employment. *See id.* At bottom, Roche offers no persuasive basis on which a reasonable jury could conclude that Mr. Denoia's sincere religious beliefs did not conflict with its vaccination mandate.

In sum, we conclude that Mr. Denoia has adduced sufficient evidence from which a reasonable jury could find that he has established a *prima facie* case for Roche's failure to accommodate his religious beliefs, in violation of Title VII.

### 2.    *Roche's Burden*

Because Mr. Denoia has satisfied his initial burden of setting forth a *prima facie* case, the burden shifts to Roche to demonstrate that it offered a reasonable accommodation or that any accommodation would have imposed an undue hardship. *Ilona*, 108 F.3d at 1575–76. If an employer adequately demonstrates that it offered a reasonable accommodation, then the statutory inquiry comes to an end—that is, "the employer need not show that

each of the employee's alternative accommodations would result in undue hardship." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986).

a.    <u>Reasonable Accommodation</u>

"The reasonable accommodation requirement of Title VII is meant 'to assure the individual additional opportunity to observe religious practices, but it [does] not impose a duty on the employer to accommodate at all costs.' " *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (alteration in original) (quoting *Philbrook*, 479 U.S. at 70). As such, an accommodation is regarded as reasonable when it "eliminates the conflict between employment requirements and religious practices." *Rodriguez v. City of Chicago*, 156 F.3d 771, 775 (7th Cir. 1998) (quoting *Philbrook*, 479 U.S. at 70). "It need not be the employee's preferred accommodation or the accommodation most beneficial to the employee," *Porter*, 700 F.3d at 951, nor must it satisfy "an employee's every desire," *Rodriguez*, 156 F.3d at 777. Additionally, "a finding of reasonable accommodation is a finding of fact." *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 475 (7th Cir. 2001).

Roche contends that it adequately accommodated Mr. Denoia's religious beliefs by providing him the opportunity to seek an alternative, non-customer-facing position within the company. To support this principle, Roche cites *Wright v. Runyon*, where the Seventh Circuit characterized an employer's "bidding system," which enabled the plaintiff "to select" an alternative position that "did not interfere with his religious practices," as a "paradigm of 'reasonable accommodation.' " 2 F.3d 214, 217 (7th Cir. 1993). However, the court also noted that "[a] much more searching inquiry might also be necessary if [the plaintiff], in order to accommodate his religious practices, had to accept a reduction in pay or some

37

other loss of benefits." *Id.* Thus, *Wright* does not stand for the proposition that *any* opportunity to seek an alternative position is "reasonable as a matter of law." Def.'s Br. 20, dkt. 44.

Roche relies on the bare assertion that it reasonably accommodated Mr. Denoia to carry the day, but stops short of making any relevant factual inquiries to support the conclusion that Mr. Denoia's transfer to a non-customer-facing position was, in fact, a reasonable accommodation. Indeed, Roche has adduced no evidence demonstrating that the Trainer position into which Mr. Denoia was to move was comparable to the IT Service Engineer position. Upon reviewing the record evidence before us, it is clear that a "more searching inquiry" is necessary to resolve that question as a matter of law. *Wright*, 2 F.3d at 217.

Several additional issues of fact preclude a conclusion that Roche provided Mr. Denoia with a reasonable accommodation. First, Roche does not support, either legally or factually, its conclusion that transfer to a fixed-term position is reasonable as a matter of law. Second, Roche does not disclose whether Mr. Denoia retained his IT Service Engineer salary or whether his transfer to the Trainer position resulted in "a reduction in pay." *Id.* Lastly, Roche neglects to confront the record evidence establishing that the benefits offered to fixed-term employees "differ from those offered to regular employees," including exclusion from "the Roche Annual Bonus Plan, Roche Long Term program," and "severance benefits," among other benefits. Dkt. 57-14 at 1. On the record before us, a jury could fairly conclude that Mr. Denoia was not reasonably accommodated by virtue of his transfer to a

different position within the company. Accordingly, Roche has not demonstrated its entitlement to judgment as a matter of law.

Mr. Denoia, for his part, contends that his transfer to a non-customer-facing position was both unnecessary and unreasonable because Roche could have accommodated him in his IT Service Engineer position by requiring masking, testing, and social distancing. According to Mr. Denoia, job reassignment constitutes a reasonable accommodation "*only* after the employer has determined that the employee cannot be accommodated in his or her current position." Pl.'s Resp. Br. 34, dkt. 48 (emphasis in original).

We are not persuaded by Mr. Denoia's argument, first, because the cases upon which he relies involved disability accommodations under the Americans with Disabilities Act ("ADA")—not religious accommodations under Title VII. The Seventh Circuit has explicitly cautioned that "the meaning of 'reasonable accommodation' " cannot "be simply imported wholesale" from Title VII to the ADA. *Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1048 (7th Cir. 1996). Mr. Denoia has failed to offer any sound legal basis on which to apply ADA case law to the facts at bar.

More importantly, Mr. Denoia's position contradicts well-established law that, "[o]nce an employer has offered an alternative that reasonably accommodates the employee's religious needs," it has satisfied its legal obligation under Title VII. *Ilona*, 108 F.3d at 1576. Because Title VII "requires only reasonable accommodation"—not "the accommodation of [the employee's] choosing"—the fact that the employee might prefer a different accommodation is immaterial to the Title VII inquiry. *Rodriguez*, 156 F.3d at 776 (internal quotations and citation omitted). Thus, Mr. Denoia's insistence that Roche was legally

required to explore alternative accommodations (short of transfer) is patently incorrect as a matter of law. While "the option to submit to regular testing in lieu of vaccination" has been found to constitute a "reasonable accommodation," it certainly is not the *only* way in which an employer is obliged to accommodate an employee's religious beliefs. *See Bowlin v. Bd. of Directors of Judah Christian Sch.*, 695 F. Supp. 3d 1003, 1008 (C.D. Ill. 2023), *appeal docketed*, No. 23-3049 (7th Cir. Oct. 24, 2023). Moreover, the fact that Mr. Denoia might have preferred masking, testing, and social distancing instead of transfer likewise has no bearing on the reasonableness of the accommodation he received.

That said, a genuine dispute of material fact remains as to whether Roche did, as a matter of law, provide a reasonable accommodation to Mr. Denoia. On the record before us, a reasonable jury could find that allowing Mr. Denoia to apply for different positions within the company and eventually transferring him to a temporary position with less benefits was not a reasonable accommodation. Roche, therefore, is not entitled to summary judgment on the issue of reasonable accommodation.

b.   Undue Hardship

An employer need not accommodate an employee's religious beliefs where such accommodation imposes an "undue hardship." 42 U.S.C. § 2000e(j). An employer seeking to establish an undue hardship must adduce evidence showing that the "burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). "[C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including

the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* at 470–71 (cleaned up).

Roche asserts that accommodating Mr. Denoia's religious beliefs would have imposed an undue burden because, without the COVID-19 vaccination, Mr. Denoia could not perform the essential functions of his job as an IT Service Engineer; and because "it was administratively costly and difficult for Roche to accommodate non-vaccinated employees in customer-facing positions." Def.'s Br. 20, dkt. 44. As evidence, Roche points to Mr. Denoia's admission that his former position was customer-facing, Denoia Dep. 90:2–5, dkt. 58-1, as well as the Declaration of Arman Ebrahimi, Mr. Denoia's former supervisor, wherein he states that in-person customer meetings are an essential function of the IT Service Engineer position; that Roche could not meet customer demand unless all of its IT Service Engineers were vaccinated; and that "it was very difficult to administratively keep track of Roche customers who required vendors to be vaccinated." Ebrahimi Decl. ¶¶ 20–21, dkt. 59-13.

Mr. Denoia identifies various disputes of material fact that, we agree, preclude the entry of summary judgment. First, although Roche justifies the denial of Mr. Denoia's exemption request on the grounds that the IT Service Engineer position is "customer-facing," Mr. Denoia has adduced evidence that Roche approved vaccination exemptions for (at least) three customer-facing employees. *See* dkt. 57-5; dkt. 57-6; dkt. 57-7. Roche's accommodations of other customer-facing employees undermine its contention that doing so for Mr. Denoia would have caused an undue hardship. Second, Mr. Denoia highlights that, despite Roche's vague references to "administrative difficulties," Roche does not identified

41

a single customer that required proof of vaccination from its vendors. Def.'s Resp. to Pl.'s First Interrog. 3–4, dkt. 57-18; Ricchio & Stephens Dep. 64:2-65:6, dkt. 57-15.

All in all, Roche adduces no concrete evidence to support a conclusion that accommodating customer-facing employees, such as Mr. Denoia, would have been "administratively costly and difficult." For instance, Roche puts forth no specific details about "substantial increased costs in relation to the conduct of [its] particular business." *Groff*, 600 U.S. at 470. Nor does Roche elaborate on the "practical impact" of the accommodation "in light of the nature, size, and operating cost" of its business. *Id.* at 470–71. On this record, we are unable to conclude that Roche has carried its burden of establishing an undue hardship.

In conclusion, genuine issues of material fact remain as to whether allowing Mr. Denoia to stay in his position as an IT Service Engineer would have imposed an undue hardship on Roche's overall business. Accordingly, Roche is not entitled to judgment as a matter of law.

### C.    Arizona Civil Rights Act Claim

Much like Title VII, the ACRA requires plaintiffs to file a charge of discrimination with the Arizona Civil Rights Division within 180 days of the alleged unlawful employment practice before proceeding to court. Ariz. Rev. Stat. Ann. § 41-1481(A). "A charge is deemed filed by or on behalf of a person claiming to be aggrieved if received from the United States equal employment opportunity commission." *Id.*

The record before us demonstrates that Mr. Denoia's First Charge was dual filed in Indiana—not Arizona. According to the EEOC Activity Log, the Indiana Civil Rights

Commission was selected as the deferral office on May 23, 2022. Dkt. 59-4 at 9. On July 29, 2022, the Phoenix District Office issued notice to the Indiana Civil Rights Commission that the First Charge was "initially received by Phoenix District Office . . . and will be dual-filed with Indiana Civil Rights Commission." Dkt. 59-7; *accord* dkt. 59-4 at 5. Likewise, no evidence establishes that Mr. Denoia dual-filed the Second Charge with any state agency, never mind with the Arizona Civil Rights Division.

Mr. Denoia does not attempt to refute the record evidence. Instead, he insists that his correspondence with the Phoenix District Office supports a finding that he properly exhausted his state administrative remedies. Mr. Denoia cites no legal support for this theory, namely, that his mere interactions with the EEOC's Phoenix District Office amount to his having filed a charge of discrimination with the Arizona *state* agency. Moreover, the ACRA provides that "[a] charge is deemed filed . . .  if received *from*" the EEOC. Ariz. Rev. Stat. Ann. § 41-1481(A). There is no evidence presented here that the Arizona Civil Rights Division "received" Mr. Denoia's First Charge—or, for that matter, *any* charge of discrimination—"from" the EEOC. Thus, with little difficulty, we conclude that Roche is entitled to summary judgment on Mr. Denoia's ACRA claim, as no reasonable jury could find that Mr. Denoia properly and timely filed his charges of discrimination with the Arizona Civil Rights Division.

## CONCLUSION

For the reasons explicated above, Roche's Motion for Summary Judgment, dkt. 43, is **GRANTED in part** and **DENIED in part**. Roche's motion is **GRANTED** as to Mr. Denoia's Title VII disparate treatment and retaliation claims; his ADEA discrimination

claim; and his ACRA claim. Roche's motion is **DENIED** as to Mr. Denoia's Title VII fail-

ure-to-accommodate claim.

Roche's Motion to Strike, dkt. 52, is **DENIED**.

This case shall proceed accordingly.

IT IS SO ORDERED.

Date:

_____12/20/2024_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

David Arthur Campbell, III
Gordon Rees Scully Mansukhani -Columbus
dcampbell@grsm.com

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC (Indianapolis)
ad@bdlegal.com

Hunter Edmonds
Gordon Rees Scully Mansukhani, LLP
hedmonds@grsm.com

Taylor Jon Ferguson
Biesecker Dutkanych & Macer, LLC
tferguson@bdlegal.com